RECEIVED
IN LAKE CHARLES, LA
JUN 14 2013
TONY R. MOORE, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | |
|---|---|
| LEONARD BROUSSARD AND BERTHA THIBODEAUX | Docket No. 11CV01446 |
| VERSUS | JUDGE MINALDI |
| CHEVRON USA, ET AL. | MAGISTRATE JUDGE KAY |

MEMORANDUM RULING

Before the court is a Motion for Partial Summary Judgment (Rec. Doc. 65) filed by Chevron U.S.A. Inc., individually and as successor in interest under the claims of this lawsuit, to Getty Oil Company and Tidewater Oil Company, Chevron U.S.A. Holdings Inc., and Four Star Oil & Gas Company (collectively, "Chevron"). The plaintiffs filed an Opposition (Rec. Doc. 89). Chevron filed a Reply (Rec. Doc. 98).

The plaintiffs filed suit against Chevron and others on June 28, 2011, alleging that Chevron's operations on the plaintiffs' property in Sections 13 and 14, Township 12 South, Range 4 West in Cameron Parish (the "Subject Property") constituted a breach of, or failure to fulfill, its obligations under a lease agreement entered into between the plaintiffs' predecessors and Chevron's predecessors in interest.

The plaintiffs claim that Chevron failed to restore the Subject Property to its original condition. Plaintiffs also allege a failure by Chevron to perform under the lease agreement in good faith, as required by Louisiana Civil Code article 1983, which provides that "[c]ontracts must be

performed in good faith."[1] La. Civ. Code Ann. art. 1983. Chevron argues that any contractual claim has prescribed.

## Summary Judgment Standard

A court will grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The party moving for summary judgment is initially responsible for demonstrating the reasons justifying the motion for summary judgment by identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact for trial. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). "Furthermore, the party moving for summary judgment must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 323). "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Id.*

If the movant satisfies this burden, however, then the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Tubacex*, 45 F.3d at 954. In evaluating motions for summary judgment, the court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, a grant of summary judgment is warranted when the record as a whole "could not lead

---

[1] "Good faith" only comes into play when a party has proved the breach of a specific contract obligation. *Favrot v. Favrot*, 2010-0986 (La. App. 4 Cir. 2/9/11), 68 So.3d 1099, 1109-1110. Because this court has held that the contract claim has prescribed, the court need not discuss the "good faith" argument.

2

a rational finder of fact to find for the non-moving party." *Id.*

Facts

This is a dispute over the scope of responsibility for cleaning up agricultural land contaminated by Defendant's oil and gas exploration activities during the time period 1965-1976. The plaintiffs are siblings who inherited property located in Sections 13 and 14, Township 12 South, Range 4 West in Cameron Parish (the "Property") from their father, Wallace J. Broussard, the original lessor of the Property under the Lease.

The Property at issue has been used by the Broussard family for rice and cattle farming for more than 50 years and continues to be dedicated to rice farming.[2] The Property was the subject of a Lease executed by the plaintiffs' father, Wallace Broussard and Bryant A. Fehlmen in 1962. Among other terms, the Lease expressly required that "Lessee shall be responsible for all surface damages to the land, buildings, irrigation wells and all other improvements thereon, caused by its operations hereunder and Lessee shall restore the surface of the land, as near as practicable, to its original condition following cessation of operations thereon, if any."[3] All provisions of the Lease were specifically extended to, and binding on, "successors and assigns (in whole or in part) of Lessor and Lessee."[4]

Contemporaneous with its execution, the Lease was assigned to Tidewater Oil Company ("Tidewater"). See November 9, 1962 Assignment to Tidewater. The assignment specifically and

---

[2] See January 31, 2013 Deposition of Leonard Broussard ("Broussard Dep.") at pp. 12:20-13:3, 40:14-19.

[3] November 8, 1962 Lease at ¶8.

[4] *Id.* at ¶9.

expressly conveyed the original lease, "together with all rights thereunder and incident thereto. *Id.* In 1967, Tidewater merged with Getty Oil Company. The merger conveyed all of Tidewater's existing property, rights and obligations, including those rights and obligations set forth in the Lease at issue.

During the life of the Lease, Chevron drilled oil, gas and saltwater wells and constructed separators, pumps, tanks, and pits.[5] The plaintiffs argue that the expert reports (Plaintiff Ex. 7; 2012 Trinity Environmental Assessment), Ex. 8 (Norman) and Ex. 9(Templet), demonstrate that the activities and facilities associated with the defendant's oil and gas operations, caused the release of hazardous and toxic constituents into the surface of the plaintiffs' property.

During the life of the Lease and in the time period following the defendant's relinquishment of its interest in the Property, the plaintiffs argue that no evidence has ever been produced which suggests any communications between the defendant, the plaintiffs or anyone else took place concerning the potential environmental harm that may result from oil and gas operations.[6] The plaintiffs submit that this is true during both the time period that Chevron "denied" knowledge of the potential for environmental harm and even after Chevron learned that its production pits were leaching hazardous constituents into the soil.[7]

The plaintiffs further submit that there is no evidence that prior to the filing of this lawsuit, the defendant took any steps to determine whether any of the oil and gas waste stored on the

---

[5] See January 24, 2013 Deposition of Norman Duplantis, Fed. R. Civ. P. 30(b)(6) Witness for Defendant ("Duplantis Dep.") attached as Ex. 6, at pp. 195:9 -197:5.

[6] Duplantis Dep. at pp.182:8-15,221:23-222:2.

[7] *Id.* at pp. 184:2-185:3.4 .

4

plaintiffs' property, leached into the soil or caused environmental harm.[8] Broussard argues that just as the defendant failed to test the plaintiffs' property or communicate with the plaintiffs about the potential for environmental harm, the defendants also failed to produce any evidence which shows that steps were taken to comply with the restoration provisions of the Lease at any time, including the time surrounding the execution of the release.

The plaintiffs submit that they do not have any experience or familiarity with oil and gas operations, including the nature of the oilfield activities at issue in this lawsuit.[9] As a result, in 2011, the plaintiffs retained experienced counsel to investigate whether their property had been contaminated as a result of historic oil and gas operations. As part of this investigation, plaintiffs' Counsel retained the services of Trinity Environmental ("Trinity") to investigate the environmental condition of the Property.[10] Trinity's investigation and the samples collected confirmed the presence of constituents traditionally associated with oilfield activities. Based on this information[11] the plaintiffs filed this suit on June 28, 2011 seeking damages from the defendant alleging inter alia claims of negligence, breach of contract/lease, and violations of the mineral code. See Pls. Compl.

Law

Under applicable Louisiana law, the prescriptive period for a breach of contract claim is ten

---

[8] *Id.* at pp. 195:3-8, 246:3-7, 291:2-11.5.

[9] Broussard Dep. at pp. 98:16-99:21; ThibodeauxDep. at pp.25:7-26:22, 39:14-41:4.

[10] See 2011 Trinity Environmental Report. Trinity conducted a field investigation on March 30-April 1, 2011. *Id.*

[11] Chevron argues that the plaintiffs cannot rely upon their petition to meet their burden to show the applicability of *contra non valentem*, nor can they rely upon Trinity's report as it is an unsworn expert report, which is not competent summary judgment evidence. *Winstead v. Georgia Gulf Corp.*, 77 F. App'x 267, 271 (5th Cir. 2003).

years from the date a cause of action arose. La.Civ. Code Ann. Art. 3499 (1983). In the case of a mineral lease, a cause of action for breach of the lease arises upon termination of the lease.[12] The defendant bears the burden of proof to show that the plaintiffs' claims are barred by prescription.[13] Once it is shown that more than 10 years has elapsed between the date the cause of action arose and the date a suit was filed, the burden shifts to the plaintiffs to demonstrate why prescription should be suspended, interrupted, or otherwise excepted. *Id.*

The prescriptive period on a personal action, such as an action for breach of a lease contract, is 10 years. La. C.C. art. 3499. As this contract claim has prescribed on its face, the plaintiffs have the burden of proving it has not prescribed.[14] The plaintiffs do not dispute that the Lease in question terminated at the latest in 1988 when the defendant executed a release and that more than 10 years elapsed between that date and the filing of this lawsuit in 2011.[15] However, the plaintiffs assert that the doctrine of *contra non valentem* applies to create an exception to the statutory prescription period because they did not know and could not have known any of the facts giving rise to their cause of action against the defendant until Trinity completed its field investigation in Spring 2011. The plaintiffs argue that they do not have an explicit obligation or affirmative duty to go out and search their properties for evidence of contamination. Thus they argue that, at a minimum, a genuine issue

---

[12] *St. Martin v. Quintana Petroleum Corp.*, No. Civ. A 98-2095, 1999 WL 232635, at *2(E.D. La. Apr. 19, 1999).

[13] *Terrebonne Parish School Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877(5thCir. 2002).

[14] *Marin v. Exxon Mobil Corp.* 48 So.3d 234, 256, 2009-2368 (La. 10/19/10), (La.,2010).

[15] Duplantis Dep. at pp.162:21-167:9, 252:23-254:20, 259:6-260:17, 262:6-263:6, 67:4-11, 301:2-14.

of material fact exists concerning whether the plaintiffs knew or should have known that the defendant(or its predecessors) had failed to comply with the terms of the applicable contract, much less that the plaintiffs' property was damaged as a result of the defendant's operations.

Although LSA–C.C. art. 3467 provides that "prescription runs against all persons unless exception is established by legislation," Louisiana jurisprudence has long recognized the doctrine of *contra non valentem* as a means of suspending the running of prescription when the circumstances of a case fall within one of four categories.[16] *Contra non valentem non currit praescriptio* means that prescription does not run against a person who could not bring his suit.[17] The Louisiana Supreme Court has recognized that the doctrine of *contra non valentem* is used to soften the occasional harshness of prescriptive statutes.[18]

In *Plaquemines Parish Commission Council v. Delta Development Company, Inc.*, 502 So.2d 1034, 1056 (La.1987), the Louisiana Supreme Court held that "[t]here is no question but that *contra non valentem* continues to be a viable exception to the running of liberative prescription in Louisiana." This Court recognized the four instances where *contra non valentem* can be applied to prevent the running of prescription: (1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) where there was some condition coupled with the contract or connected with the proceedings which prevented the

---

[16] *See* Frank L. Maraist and Thomas C. Galligan, *Louisiana Tort Law* § 10–4(b), 222 (1996).

[17] *Harvey v. Dixie Graphics, Inc.*, 593 So.2d 351, 354 (La.1992); *see also, Cartwright v. Chrysler Corp.*, 255 La. 597, 232 So.2d 285, 287 (1970).

[18] *Carter v. Haygood*, 04–646 (La.1/19/05), 892 So.2d 1261, 1268.

creditor from suing or acting; (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and (4) where the cause of action is not known or reasonably knowable by the plaintiff, even though this ignorance is not induced by the defendant. These categories allow "the courts to weigh the 'equitable nature of the circumstances in each individual case' to determine whether prescription will be tolled."[19]

In the case at bar, the fourth category of *contra non valentem*, commonly referred to as the "discovery rule," is at issue.[20] When the fourth category is at issue, the plaintiff is required to show that his ignorance of his cause of action was not attributable to his own willfulness or neglect.

In *Marin*, a case similar to the one at bar, sugarcane farmland owners sued Exxon for damages when their lands were contaminated by oilfield wastes deposited in unlined earthen pits. Exxon argued that the plaintiffs' claims had prescribed because they were or should have been aware of the contamination as early as 1991, yet did not file suit until 2003. This Court held that by 1995, the dying sugarcane on Plaintiffs' land put them on sufficient notice of the possible contaminants and that it was unreasonable for the Plaintiffs to wait eight years to file suit. *Id.* at 251.

The Louisiana Supreme Court in *Marin* described the knowledge sufficient to start the running of prescription under the fourth category of *contra non valentem* as constructive knowledge, or the " 'acquisition of sufficient information, which, if pursued, will lead to the true condition of things.' "[21] According to *Marin*, "the ultimate issue in determining whether a plaintiff had

---

[19] *Id.* at 1054, 1055; *Wells v. Zadeck*, 89 So.3d 1145, 1150, 2011-1232 (La. 3/30/12), (La.,2012).

[20] *Marin v. Exxon Mobil Corp.*, 09–2368 (La.10/19/10), 48 So.3d 234.

[21] *Marin*, 09–2368 at 13–14, 48 So.3d at 246.

8

constructive knowledge sufficient to commence a prescriptive period is the reasonableness of the plaintiff's action or inaction in light of his education, intelligence, and the nature of the defendant's conduct."[22]

In *Hazelwood Farms, Inc. v. Liberty Oil and Gas Corp.*, 02–266, p. 12 (La.App. 3 Cir.4/2/03), 844 So.2d 380, 389, the court held:

> Damage is sustained, within the meaning of prescription, only when it has manifested itself with sufficient certainty to support the accrual of a cause of action. *Cole v. Celotex Corporation*, 620 So.2d 1154 (La.1993). The damages suffered must at least be actual and appreciable in quality. Where a claimant has suffered some but not all damages, prescription runs from the day on which he suffered actual and appreciable damages even though he may thereafter realize more precise damages. *Harvey v. Dixie Graphics, Inc.*, 593 So.2d 351 (La.1992). However, prescription will not commence at the earliest possible indication that plaintiff may have suffered some wrong. It will begin to run when plaintiff has a reasonable basis to pursue a claim against a specific defendant. *Jordan v. Employee Transfer Corporation*, 509 So.2d 420 (La.1987). Prescription should not be used to force a potential plaintiff who believes that he may have a cause of action to rush to the courthouse to file suit against all parties that may have caused the damage. *Miley v. Consolidated Gravity Drainage District No. 1*, 93–1321 (La.App. 1st Cir.9/12/94); 642 So.2d 693.[23]

Likewise, in *David, id.*, the court reasoned that until the expert rendered his opinion that the ground water was contaminated with high levels of arsenic and that this could be the cause of the high incidence of certain types of cancer in the area affected by the contamination, the plaintiffs were not aware of the injury they may have suffered or of the effects the contamination of their soil and groundwater may have upon them and their children in the future. In other words, until that time the damage had not "manifested itself with sufficient certainty to support the accrual of a cause of

---

[22] *Marin*, 09–2368 at 15, 48 So.3d at 246; *Wells v. Zadeck*, 89 So.3d at 1150-1151.

[23] *David v. Velsicol Chem. Corp.* 49 So.3d 997, 1011, 2009-1237 (La.App. 3 Cir. 10/27/10), (La.App. 3 Cir.,2010); *Labbe Serv. Garage, Inc. v. LBM Distrib., Inc.*, 94–1043, p. 11 (La.App. 3 Cir.2/1/95), 650 So.2d 824, 829.

Case 2:11-cv-01446-PM-KK   Document 121   Filed 06/14/13   Page 10 of 15 PageID #: 4503

action." *Id.* Likewise, until the plaintiffs realized that the cattle dip used prior to 1970 was the likely cause of the arsenic contamination, they could not have had a reasonable basis "to pursue a claim against a specific defendant." *Id.*

The Broussard plaintiffs allege that they had no way of knowing that their property was contaminated. They did not experience difficulty with their crops. They are limited in education. Until an expert came and assessed their property, they could not know of the existence of the cause of action against Chevron. Alternatively, Broussard argues that if any doubt remains as to whether the plaintiffs acted reasonably in waiting until 2011 to bring this suit, this is a question of fact which precludes summary judgment.

In the Reply, however, Chevron argues that the plaintiffs offer no evidence to show the existence of a genuine disputed issue of material fact supporting their contention that *contra non valentem* suspends the prescription of their breach of contract claims because they have failed to show the actual or constructive knowledge of Wallace J. Broussard, the original lessor.[24] Chevron argues that although the plaintiffs themselves may lack actual or constructive knowledge, this is only part of the plaintiffs' burden of proof. The plaintiffs must also show that Wallace J. Broussard, their deceased father, lacked actual or constructive knowledge of a contract claim for restoration of the Subject Property. Prescription runs against all persons unless exception is established by legislation. LSA-C.C. art. 3467. No exception established by legislation prevents the running of prescription on this contract claim from the date of termination of the contract, so the actual or constructive knowledge of Wallace J. Broussard is critical. The defendant argues that the plaintiffs have failed to demonstrate this essential element of *contra non valentem*. The court finds Chevron's argument

---

[24] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

persuasive.

The Louisiana Supreme Court held in *Cole v. Celotex*, 620 So. 2d 1154 (La. 1993), that a breach of contract is only recognized once it has manifested "with sufficient certainty," and that only actual knowledge will defeat the application of *contra non valentem* to a cause of action otherwise prescribed. In *Hogg v. Chevron USA, Inc.*, 2009-2632 (La. 7/6/10), 45 So. 3d 991, a case involving claims of contamination to immovable property, the Louisiana Supreme Court described the "constructive knowledge" sufficient to start the running of prescription in a legacy action:

> Constructive knowledge has been defined by our courts as whatever notice is enough to excite attention and put the injured party on guard or call for inquiry. *Campo v. Correa*, 01-2707, p.12 (La. 6/21/02); 828 So. 2d 502, 510-11. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry might lead, and such information or knowledge as ought to reasonably put the injured party on inquiry is sufficient to start the running of prescription. *Id.* In assessing whether an injured party possessed constructive knowledge sufficient to commence the running of prescription, this court's ultimate consideration is the reasonableness of the injured party's action or inaction in light of the surrounding circumstances. *Id;* *Griffin v. Kinberger*, 507 So. 2d 821, 824 n. 2 (La. 1987).[25]

In the case at bar, the knowledge of the plaintiffs is not the only issue. The plaintiffs also have the burden of showing that Wallace J. Broussard neither knew, nor should have known through the exercise of due diligence, of a claim for enforcement of the 1962 lease.

Competent summary judgment evidence establishes that Wallace J. Broussard died in 1996.[26] It is undisputed that oil and gas exploration and production operations on the property at issue ceased no later than 1976. The 1962 Lease expired under its own terms, due to non-production, no

---

[25] *Id.*, at 997-998.

[26] January 31, 2013 deposition of Leonard Broussard, p. 13, lines 11-12.

later than early 1977.[27]

The plaintiffs must, therefore, show a genuine material issue of disputed fact exists with regard to whether their father, Wallace J. Broussard, can claim the protection of *contra non valentem* – specifically, that the contract claim at issue was "neither known...nor reasonably knowable" to him.[28]

In support of their position, Chevron cites *Wells v. Zadeck*, 2011-2032 (La. 3/30/12), 89 So.3d 1145, 1147-1149. *Wells* involved a claim by a plaintiff family member for unpaid royalties. The defendant asserted a prescription defense under LSA-C.C.P. art. 3499 (the Civil Code article establishing a ten-year statute of limitations for personal actions, including contract actions). The plaintiff claimed the benefit of *contra non valentem*. The Louisiana Supreme Court examined the actual and constructive knowledge of both the plaintiff's mother (who acquired an interest in the lease in question in 1949, and died in 2002) and the plaintiff himself in deciding that *contra non valentem* suspended the running of prescription.

The evidence submitted by Chevron shows that Wallace J. Broussard initialed the restoration provision in the 1962 Lease.[29] The provision was typewritten, in contrast to the "form" provisions preceding and following this provision.[30] This provision received particular attention from Wallace J. Broussard.

---

[27] January 24, 2013 deposition of Norman Duplantis, p. 309, lines 6-8.

[28] Marin 48 So. 3d at 245 (citing Plaquemines Parish Com'n Council v. Delta Dev. Co., Inc., 502 So. 2d 1034 (La. 1987)). See also Rec. Doc. 89, pp. 7-8.

[29] See Rec. Doc. 65-2.

[30] See Rec. Doc. 65-2, attached to Chevron's Motion for Partial Summary Judgment on Contract Claims (Rec. Doc. 65) as Exhibit B.

Furthermore, the evidence establishes that Wallace J. Broussard actually did communicate with Getty about the suspected contaminates. Wallace J. Broussard asserted a complaint of damage to his livestock caused, he believed, by oil and gas operations on his property. Norman Duplantis testified in his deposition, that Wallace J. Broussard, the plaintiffs' predecessor in title, communicated concerns about conditions on the surface of the property to Getty Oil Company. On June 23, 1971, Wallace J. Broussard submitted a claim to Getty for the death of four calves, two of which were found in what Wallace J. Broussard refers to in handwritten correspondence as a "saltwater pit."[31] Included with Wallace J. Broussard's correspondence was a copy of a statement from Wallace J. Broussard's veterinarian stating that one of the calves "ingested toxic materials."[32] In response, Getty not only compensated Wallace J. Broussard for his loss, but, as a protective measure, also constructed a fence around the saltwater pit to keep Wallace J. Broussard's cattle out and to avoid any claims associated with the saltwater pit in the future.[33]

In late September 1971, Wallace J. Broussard made a claim for the death of three more calves found near the W.J. Broussard Tank Battery located on the Subject Property.[34] Getty internal

---

[31] Exhibit M, Excerpts from January 24, 2013 deposition of Chevron U.S.A. Inc., through Norman Duplantis, p. 310, lines 6-25, through p. 312, lines 1-13; Exhibit N, being Exhibit 17 to Chevron U.S.A. Inc. deposition; Exhibit O, A2116370-0001914. All "A" series documents were produced by Chevron in this litigation. Plaintiffs state, in their discovery responses, that they "anticipate using all of the documents produced by Plaintiffs and Defendants during the course of discovery...." Exhibit P, Plaintiffs' Fourth Supplemental Objections and Responses to Chevron
U.S.A. Inc., et al, First Request for Production of Documents.

[32] Chevron Exhibit Q, A2116370-0001916-0001917

[33] Exhibit M, Excerpts from January 24, 2013 deposition of Norman Duplantis, p. 312, lines 6-13; Exhibit R, A2116370-0001913.

[34] Exhibit S, A2116370-0001907.

correspondence shows that Wallace J. Broussard's veterinarian indicated "that the calves died from drinking the water near the W.J. Broussard Tank Battery."[35] On December 13, 1971 Getty obtained a release and receipt from Wallace J. Broussard for this claim. [36]

Plaintiffs fail to present any evidence as to the actual or constructive knowledge of Wallace J. Broussard, the original lessor. The evidence submitted by Chevron, however, demonstrates at the very least constructive knowledge. The plaintiffs offer no evidence to show why, with his emphasis upon the restoration provision, Wallace J. Broussard did not acquire constructive knowledge sufficient to start the running of prescription on a claim to enforce that particular provision.

In examining Wallace J. Broussard's constructive knowledge, this Court must examine the reasonableness of the plaintiffs' actions in light of the knowledge he possessed.[37] Wallace J. Broussard procured testing of the surface on the Subject Property and he claimed that Getty was responsible for his livestock loss, and sought and received compensation from Getty for this loss. Leonard Broussard confirmed that, as a farmer, he would use consultants who were available to take soil samples to determine appropriate fertilizer and/or pesticide/herbicide levels to apply to the property.[38] Wallace J. Broussard and Leonard Broussard had ready access to resources to sample surface media on the Subject Property. Wallace J. Broussard hired a veterinarian to conduct sampling on two occasions, in the course of investigating the death of his cows. Wallace J. Broussard had

---

[35] Chevron Exhibit T, A2116370-0001905.

[36] Chevron Exhibit U, A2116370-0001894. The receipt and release itself has not been found.

[37] *Wells v. Zadeck*, 89 So.3d 1145, 1150, 2011-1232 (La..2012).

[38] Chevron Exhibit L, excerpts from January 31, 2013 deposition of Leonard Broussard, p. 43, lines 11-25, through p. 44, lines 1-9.

enough information to warrant further investigation, when operations ceased in 1976 or 1977, into whether the Subject Property had been restored as required by the 1962 Lease.

The summary judgment evidence establishes that Wallace J. Broussard knew, or could be reasonably expected to have known, of any claim of non-compliance with the lease restoration condition. He had constructive knowledge which would preclude the applicability of the *contra non valentem* exception to prescription. There is no genuine issue of material fact, therefore, Chevron's Motion for Partial Summary Judgment on contract claims will be granted.

Lake Charles, Louisiana, this 14 day of June, 2013.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE