RECEIVED
IN LAKE CHARLES, LA
OCT 25 2013
TONY R. MOORE, CLERK
BY_____ DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| LEONARD BROUSSARD & BERTHA THIBODEAUX | * | CIVIL ACTION NO. 2:11-CV-01446 |
| Plaintiffs | * | |
| V. | * | JUDGE MINALDI |
| CHEVRON, U.S.A., ET AL. | * | |
| Defendants | * | MAGISTRATE JUDGE KAY |

*********************************************************************

## MEMORANDUM RULING

Before the court is the Plaintiff's Rule 54(b) Motion to Reconsider the Court's Memorandum Ruling of June 14, 2013 [Doc. 163], filed by Leonard Broussard and Bertha Thibodeaux (plaintiffs) contemporaneously with Plaintiff's Opposition to Defendant's Motion for Summary Judgment on All Remaining Claims and Memorandum in Support of Rule 54(b) Motion to Reconsider the Court's Memorandum Ruling of June 14, 2013 [Doc. 162], the latter setting forth in detail the evidence and arguments set forth in the former.[1] Chevron, U.S.A., (defendant), individually and as successor in interest under the claims of this lawsuit to Getty Oil Company and Tidewater Oil Company, Chevron U.S.A. Holdings, Inc., and Four Star Oil & Gas Company, filed a Memorandum in Opposition [Doc. 169], to which the plaintiff has timely replied [Doc. 177]. For the reasons set forth below, the plaintiff's Motion is hereby **DENIED**.

### FACTS AND PROCEDURAL BACKGROUND

As the facts herein have been detailed in the court's prior ruling in this matter, they will not be fully repeated here.[2] Briefly, the underlying dispute herein pertains to the cleanup costs of the plaintiff's land which was allegedly contaminated by the defendant's predecessor's in title's

---

[1] Pl.'s Rule 54(b) Mot. to Reconsider [Doc. 163], at ¶ 17.
[2] *See* Memo. Ruling [Doc. 121], at 1-5.

1

oil and gas exploratory activities between 1965 and 1976.[3] The property, located in Sections 13 and 14, Township 12 South, Range 4 West in Cameron Parish (the property) was inherited by the sibling plaintiffs from their father, Wallace J. Broussard, who originally leased the property to the defendant.[4]

The lease, executed in 1962, contained a provision that stated that "Lessee shall be responsible for all surface damages to the land, buildings, irrigation wells and all other improvements thereon, caused by its operations hereunder and Lessee shall restore the surface of the land, as near as practicable, to its original condition following cessation of operations thereon, if any."[5] The defendant, while a lessee, drilled oil, gas and saltwater wells, constructed separators, pumps, tanks and pits on the property, and it was this activity that allegedly caused the release of a number of toxic and hazardous substances into the surface of the plaintiff's property.[6]

The plaintiffs filed suit in state court against the defendant and others on June 28, 2011.[7] The plaintiffs alleged that the defendant's activities on the property constituted a breach of the provision of the lease agreement insofar as the defendant had contaminated the property and had failed to restore the land to its original condition.[8]

The defendant filed a Motion for Partial Summary Judgment [Doc. 65]. The plaintiffs filed an Opposition [Doc. 89], to which the defendant filed a Reply [Doc. 98]. In its Memorandum Ruling, the court rejected the plaintiffs' argument for the application of the *contra non valentem* exception to prescription, finding that Wallace J. Broussard, the plaintiffs' father

---

[3] Memo. Ruling [Doc. 121], at 3.
[4] *Id.*
[5] Lease, executed Nov. 8, 1962 [Doc. 65-2], at ¶ 8.
[6] *See* Memo. Ruling [Doc. 121], at 4. Depo. Of Norman Duplantis [Doc. 89-8], at 20-22.
[7] Pet. [Doc. 1-2].
[8] *See generally id.*

2

and predecessor in title, could be said to have had constructive knowledge of the condition of the property which would preclude the exception's application.[9] This was predicated primarily on his knowledge of the deaths of several head of cattle on his property and his settlement with the defendant's predecessor in title in response to these deaths.[10]

The prescriptive period for a breach of contract claim under Louisiana law is ten years from the date a cause of action arises. LA. CIV. CODE. ANN. art. 3499 (1983). A cause of action for breach of a mineral lease arises upon termination of the lease. *St. Martin v. Quintana Petroleum Corp.*, No. 98-2095, 1999 WL 232635, at *2 (E.D. La. Apr. 19, 1999). Thus, as more than ten years had elapsed since the termination of the lease, the plaintiffs argued for the application of *contra non valentem* to prevent a finding of prescription as to the plaintiffs' claims.

The plaintiffs have filed the instant Motion seeking to reverse the court's previous ruling in this matter. The plaintiffs essentially argue that Wallace J. Broussard did not possess constructive knowledge sufficient to preclude the application of *contra non valentem*, and that the cows in question died from drinking water allegedly contaminated with weed killer.[11] This, the plaintiffs argue, "does not provide constructive knowledge of subsurface or other contamination from oil and gas operations."[12]

## RULE 54 MOTION TO RECONSIDER STANDARD

Rule 54(b) states that

> [a]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the

---

[9] *See* Memo. Ruling [Doc. 121], at 15.
[10] *Id.* at 12-15.
[11] Pl.'s Rule 54 Mot. to Reconsider [Doc. 163], at ¶ 10.
[12] *Id.*

3

entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

FED. R. CIV. PRO. 54(b). A district court judge has considerable discretion in determining whether relief under Rule 54(b) is warranted. *Livingston Downs Racing Ass'n v. Jefferson Downs Corp.*, 259 F. Supp. 2d 471, 475 (M.D. La. 2002). Although the standard for a motion to reconsider pursuant to Rule 54(b) is somewhat less onerous than the standards for relief under Rules 59 and 60, similar considerations inform the analysis. *Nierman v. Ohio Cas. Ins. Co.*, No. 10-0319, 2012 U.S. Dist. LEXIS 42904, at *8 (W.D. La. Mar. 28, 2012) (citations omitted). "Such considerations include whether the movant is attempting to rehash its previously made arguments or is attempting to raise an argument for the first time without justification." *Leong v. Cellco P'ship*, No. 12-0711, 2013 U.S. Dist. LEXIS 109814, at *14 n. 9 (W.D. La. July 31, 2013) (citing *Valles v. Frazier*, No. 08-501, 2009 U.S. Dist. LEXIS 110790, at *2 (W.D. Tex. Nov. 30, 2009)). "Generally, three major grounds will justify reconsideration: '(1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice.'" *Washington v. Louisiana*, No. 11-00334, 2013 U.S. Dist. LEXIS 134363, at *4 (M.D. La. Sept. 19, 2013) (citing *Kern-Tulare Water Dist. v. City of Bakersfield*, 634 F. Supp. 656, 665 (E.D. Cal. 1986)). Nevertheless, "because it is faced with an interlocutory order, [the court] is free to reconsider its ruling 'for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law.'" *Leong*, 2013 U.S. Dist. LEXIS 109814, at *14-15 (citing *Nierman*, 2012 U.S. Dist. LEXIS 42904, at *3 (additional citations omitted)).

## LAW & ANALYSIS

The plaintiffs' Motion seeks reconsideration of the court's prior Memorandum Ruling which granted summary judgment for the defendant and held that the plaintiffs' contractual

4

claims against the defendant had prescribed.[13] As stated above, the prescriptive period on a breach of contract action is ten years. *See* LA. CIV. CODE. ANN. art. 3499 (1983). In the court's prior ruling, it was noted that Louisiana jurisprudence has "long recognized the doctrine of *contra non-valentem* as a means of suspending the running of prescription when the circumstances of a case fall within one of four categories."[14] These categories include:

> (1) Where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's actions;
> (2) Where there was some condition coupled with a contract or connected with the proceedings which prevented the creditor from suing or acting;
> (3) Where the debtor himself has done some act effectively to prevent the creditor from availing himself of his cause of action; or
> (4) Where some cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant.

*Specialized Loan Servicing, L.L.C. v. January*, No. 12-cc-2668, 2013 La. LEXIS 1561, at *8 (La. June 28, 2013) (citing *Wimberly v. Gatch*, 635 So. 2d 206, 211 (La. 1994)). "[I]f prescription is evident on the face of the pleadings, the burden shifts to the plaintiff to show the action has not prescribed." *Wells v. Zadeck*, 89 So. 3d 1145, 1149 (La. 2012) (citing *Campo v. Correa*, 828 So. 2d 502, 508 (La. 2002)).

In order for a plaintiff to successfully pursue an action outside of the prescriptive period under the fourth category above, commonly referred to as the "discovery rule," the plaintiff must make a showing that his ignorance is not "attributable to his own willfulness or neglect; that is, a plaintiff will be deemed to know what he could by reasonable diligence have learned." *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 246 (La. 2010) (citations omitted). As noted by the court in its prior ruling on this matter, in defining the knowledge sufficient to commence the running of prescription, the Louisiana Supreme Court in *Marin* described it as constructive knowledge—the

---

[13] Pl.'s Rule 54(b) Mot. to Reconsider [Doc. 163], at 1.
[14] Memo. Ruling [Doc. 121], at 7 (citing Frank L. Maraist and Thomas C. Galligan, *Louisiana Tort Law* § 10-4(b), 222 (1996).

"acquisition of sufficient information, which, if pursued, will lead to the true condition of things."[15] "[T]he ultimate issue in determining whether a plaintiff had constructive knowledge sufficient to commence a prescriptive period is the reasonableness of the plaintiff's action or inaction in light of his education, intelligence, and the nature of the defendant's conduct." *Marin*, 48 So. 3d at 246.

In the instant case, it is uncontested that the lease in question terminated in 1988 at the latest.[16] The plaintiffs, however, contend that they did not know, nor could they have known, of the accrual of their cause of action until Trinity conducted its field investigation in the spring of 2011.[17] In the court's prior ruling, the court found that Wallace J. Broussard, the plaintiffs' predecessor in title, had constructive knowledge of the contamination primarily because he communicated with Getty Oil Company (the defendant's predecessor in title) about suspected contaminates, and also because he asserted a complaint for damages to his livestock that he believed to be the result of oil and gas operations on his property.[18] The plaintiff now argues that there is at least a fact issue which should preclude summary judgment as to whether Wallace J. Broussard acquired constructive knowledge of subsurface contamination either from the 1962 lease provision itself, or from the circumstances surrounding the deaths of his cows, and that his education, intelligence, and the nature of the defendant's conduct militate towards a finding that he did not possess constructive knowledge of the contamination.

The plaintiff contends that the restoration clause[19] may not be used as evidence of the plaintiff's constructive knowledge.[20] The plaintiffs argue that, should the clause be used as

---

[15] Memo. Ruling [Doc. 121], at 8 (citing *Marin*, 48 So.3d at 246).
[16] Pl.'s Opp. [Doc. 162], at 19.
[17] *Id.*
[18] Memo. Ruling [Doc. 121], at 13.
[19] Lease, executed Nov. 8, 1962 [Doc. 65-2], at ¶ 8.
[20] *See* Pl.'s Rule 54(b) Mot. to Reconsider [Doc. 163], at 5; Pl.'s Opp. [Doc. 162], at 21.

6

evidence of constructive knowledge, then a party merely attempting to protect his rights to restoration through the insertion of such a clause into an agreement would run the risk of inserting constructive knowledge of contamination into the agreement, thereby possibly prescribing any enforcement of that very clause.[21] This point is well taken. However, the court's prior opinion drew no conclusions from the existence of the restoration clause. The prior opinion merely acknowledged the fact that Wallace J. Broussard had initialed the provision in the lease, and that the provision was typewritten in a font that distinguished itself from the rest of the form provisions.[22] It was these two facts which, in and of themselves, indicate that the lessor would have invariably have given this provision special attention. That fact notwithstanding, the court at no point states that prescription began to run in 1962, at the signing of the lease. This factor speaks more to "education and intelligence" of the plaintiff, necessary considerations under Louisiana jurisprudence. *See Marin*, 48 So.3d at 246. That Wallace J. Broussard was made aware that restoration of the land may be required following the completion of the defendant's activities, while not dispositive, does suggest that he was at least somewhat aware of the possibility of those activities having a deleterious effect on his property.

The plaintiffs also complain that the deaths of several of Wallace J. Broussard's cows cannot equate to a finding of constructive knowledge because the cows in question died from drinking water contaminated with weed killer.[23] Thus, the plaintiffs argue, the damages that are the subject of the instant suit are different in kind from the damages of which Wallace J. Broussard was made aware upon the discovery of his deceased calves.

In *Marin*, discussed in the court's prior ruling as well as in the plaintiffs' Opposition, the plaintiffs therein were found to have possessed constructive knowledge of contamination due to

---

[21] Pl.'s Opp. [Doc. 162], at 22.
[22] Memo. Ruling [Doc. 121], at 12.
[23] Pl.'s Opp. [Doc. 162], at 23-26.

the presence of dying sugarcane on their property. *Id.* at 246-47. The plaintiffs here contend that "[n]o such inference of soil or groundwater damage can be drawn from the fact that there was weed killer in or near a large unfenced pond filled with water."[24] However, the deposition of Archie Norman Duplantis, Jr., Rule 30(b)(6) representative for the defendant, indicated that Wallace J. Broussard had, at a bare minimum, suspicions that his cattle had died from poisoning in addition to that sustained by those cows who ingested weed killer.

> Q. Do you have an appreciation based on your review of the documents why those samples were taken?
> A. Yes. It was near the time that Mr. Broussard had some cattle that died.
> Q. Okay. Did he make a claim against Getty for the death of his cattle?
> A. Yes, he did.
> Q. And what did he claim? Based on the documents that you reviewed, what was his claim?
> A. The value of the cattle plus the veterinary bill.
> . . .
> Q. Based on the documents that you reviewed, what - - what did he say in his claim?
> A. In one instance the – and the claim, I think, was verified by the vet that the cattle drank the water and contents of the pit. *On the other instance*, it was they drank water that was contaminated with weed killer.
> . . .
> Q. Okay. Were there any payment of money?
> A. Yeah. He was – he was – in both instances, there was money that was transferred from Getty to Mr. Broussard.[25]

Thus, the deposition of Mr. Duplantis would seem to indicate that Wallace J. Broussard differentiated between the cattle who died from ingestion of weed killer and those that died as a result of drinking toxic substances from in and around the pit.[26]

---

[24] *Id.* at 24.
[25] Depo. of Archie Norman Duplantis, Jr. [Doc. 98-2], at 6-8 (emphasis added).
[26] The plaintiff stated that "Chevron's own corporate representative testified that Chevron's predecessors never communicated with Wallace Broussard or otherwise put him on notice of the potential for contamination of his property at the start of the lease." Pl.'s Opp. [Doc. 162], at 22 (citing Depo. of Archie Norman Duplantis, Jr. [Doc. 89-8], at 17, pp. 182:8-15 of the original). However, the deposition transcript actually reads as follows:
> Q. Do you know whether or not Tidewater or Getty communicated with the Broussards about the potential environmental harm that may result from the oil and gas operations?
> A. No, I don't.
> Q. Okay. You haven't seen anything to suggest that those communications took place?

There is evidence of sampling of the water in the pit and the ditch having been completed on June 23, 1971. On that date, Jack Sanders of Water & Industrial Waste Laboratories, Inc., wrote a letter to Edwin Baudoin at Diversified Industries, in which he stated, as to water samples taken from both the "pit" and the "ditch" area, that "[b]oth samples had a noticeable "petroleum" odor and an oil layer floated on top of each. It is concluded that the 'pit' sample is salt water containing the indicated oil and grease and the 'ditch' sample contains mainly suspended oil and grease."[27] While this indicates that the water in the pit was contaminated with something other than weed killer, it does not definitively show that Wallace J. Broussard was aware of the contamination such that constructive knowledge could be found.

Also in June of 1971, Wallace J. Broussard submitted a claim for four calves that "were in the salt water pit" and died.[28] This document does not indicate that Broussard did or did not know of the precise cause of the calves' death.

On July 19, 1971, a letter from a J.A. Smotherman to Mr. O.G. Gage, Jr., who are presumably employees of the defendant's predecessor in title, states that "[t]he veterinarian indicated that the calves died from drinking salt water and oil. Water samples were analyzed to determine if weed poison had killed the calves. The analyses were negative."[29] While this is compelling evidence that at least some of the calves did not die as a result of weed poison, but rather as a result of water contamination, this document, again, does not indicate conclusively that Broussard himself *knew* this information. Another correspondence from Wallace J.

---

A. No.
Depo. of Archie Norman Duplantis, Jr. [Doc. 89-8], at 17. Thus, contrary to the assertions by plaintiffs' counsel, this deposition testimony does not indicate that Chevron's predecessors *never communicated* with Broussard; it merely indicates that Duplantis *does not know* whether such a communication took place. While in no way dispositive, such overstatement does little to aid in either a swift or just disposition of a case *sub judice*.
[27] June 23, 1971 Letter from Jack Sanders to Edwin Baudoin [Doc. 98-3].
[28] Claim of W.J. Broussard, June 23, 1971 [Doc. 98-4].
[29] Claim for Damages, July 19, 1971 [Doc. 98-7].

Broussard to Mr. Smotherman from September of 1971[30] claims damages for the deaths of three additional calves "which died from grass poison as the test of Dr. Petry shows."[31]

The plaintiffs argue that the defendant was "drilling salt water disposal wells to inject saltwater and waste back into the ground as part of the oil and gas operations," that no one "ever told Wallace Broussard or his children or put them on notice" of such operations, and that that "is the basis for the subsurface contamination and damage here."[32] This seems a difficult contention to make, given that Wallace Broussard's claim for damages for his dead calves on June 23, 1971 stated that the calves "were in the salt water pit" when they died.[33]

The plaintiffs state that "Mr. Duplantis, Chevron's corporate representative, makes it crystal clear that Mr. Broussard's complaint addressed only the fact that Mr. Broussard's cows had drunk from a pit filled with water contaminated *with weed killer*."[34] However, when we turn to the deposition in question cited by the plaintiffs, it states, as previously discussed, as follows:

> Q. Based on the documents that you reviewed, what - - what did he say in his claim?
> A. In one instance the – and the claim, I think, was verified by the vet that the cattle drank the water and contents of the pit. On the other instance, it was they drank water that was contaminated with weed killer.[35]

It seems clear that Mr. Broussard's complaints addressed the deaths of cows that both were, and were not, the result of the ingestion of weed killer.

The question is whether, under the standard set forth in *Marin*, Wallace J. Broussard possessed "sufficient information, which, if pursued, [would have led] to the true condition of things." *Marin*, 48 So.3d at 246. "Constructive knowledge has been defined by our courts as

---

[30] *See* Pl.'s Opp [Doc. 162] at 23.
[31] Letter from W.J. Broussard to Mr. Smotherman [Doc. 98-8].
[32] Pl.'s Reply [Doc. 177] at 12.
[33] *See* Claim of W.J. Broussard, June 23, 1971 [Doc. 98-4].
[34] Pl.'s Reply [Doc. 177] at 13 (citing to Depo. of Archie Norman Duplantis [Doc. 162-7], at 57 (emphasis in original).
[35] Depo. of Archie Norman Duplantis [Doc. 162-7], at 57.

whatever notice is enough to excite attention and put the injured party on guard or call for inquiry." *Hogg v. Chevron USA, Inc.*, 45 So. 3d 991, 997-98 (La. 2010) (citing *Campo v. Correa*, 828 So. 2d 502, 510-11 (La. 2002)). Based on a thorough review of all the many attachments and exhibits in this case, it seems that Wallace J. Broussard knew to a reasonable certainty that grass poison was likely responsible for the deaths of some of his lost calves—those claimed for damages in September of 1971. However, the claim in June of 1971 for the four calves that died carried with it no explanation as to weed killer or otherwise. In fact, given the evidence in the record it seems highly likely that those calves died from ingesting contaminated water near the pit.

Several of Wallace J. Broussard's calves died in 1971. Based on the aforementioned evidence, several of those calves likely died from ingesting weed poison, and several died from ingesting salt water and oil on Wallace J. Broussard's property—substances that were the result of the defendant's activities pertaining to oil and gas exploration. Wallace J. Broussard submitted monetary claims against the defendant's predecessors in title as a result of these incidents. Moreover, as if acknowledging that the pit was a contaminated area that was unsafe for livestock, the pit was subsequently fenced off.[36]

Wallace J. Broussard possessed a working knowledge of farming and the raising of livestock. He was competent enough to deal with the oil companies in settling claims for livestock lost resulting from the defendant's activities on his property. He had sufficient information—or rather, lack of information as to the causes of death of at least some of his lost calves—as to put him on reasonable notice that further inquiry was needed. Such further inquiry within the prescriptive period would likely have revealed the presence of any contaminants. As

---

[36] Depo. of Archie Norman Duplantis [Doc. 98-2], at 8.

11

such, the court finds that the plaintiffs' request for the application of *contra non valentem* is inappropriate to these facts. Accordingly,

**IT IS ORDERED** that the Plaintiffs' Rule 54(b) Motion to Reconsider [Doc. 163] be and hereby is **DENIED**.

Lake Charles, Louisiana, this 24 day of October, 2013.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE